**Abby Greenfield, OSB No. 243463**
abby@kedwards-law.com
**LAW OFFICE OF KATHARINE EDWARDS**
P.O. BOX 417
Hillsboro, OR 97123
Telephone: (503) 664-0645

**John Burgess, OSB No. 106498**
johnburgess@civilrightsoregon.com
**Carl Post, OSB No. 061058**
carlpost@civilrightsoregon.com
**SNYDER, POST & BURGESS**
1000 SW Broadway, Suite 2400
Portland, OR 97205
Telephone: (503) 241-3617
Of Attorneys for the Plaintiff

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

#### PORTLAND DIVISION

| | |
|---|---|
| **SARAH TONIN**, | Case No. 3:26-cv-00465 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| | **(Title II of the ADA; § 1983)** |
| **STATE OF OREGON**, by and through the Oregon Department of Corrections**; MIRANDA SHOCKEY-DUNN, LISA ARRINGTON, MARICA VENTURA, GARETH FITZPATRICK, J. WILSON, MICHELE BERGMANN, DEBORAH SPRINT, WARREN ROBERTS, MICHAEL SEALE,** and **JOHN/JANE DOES 1-3,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

PAGE 1 – COMPLAINT

## PRELIMINARY STATEMENT

1.      This is an action for monetary relief brought under Title II of the Americans with

Disabilities Act (hereinafter, "ADA") and 42 U.S.C. § 1983 for violations of the Eighth

Amendment to the United States Constitution. Plaintiff, a below-the-knee amputee, was denied

access to a functional prosthetic leg while in Oregon Department of Corrections (hereinafter,

"ODOC") custody. As a result, she endured more than a year of immobility, pain, and exclusion

from basic prison activities. In addition, her other health conditions including multiple

orthopedic health concerns for the chronic pain in her hands, shoulders, and knee along with

increased risk of blood circulation impairment, were not properly addressed and worsened by her

immobility. ODOC failed to accommodate her disability, failed to coordinate timely prosthetic

repair, and acted with deliberate indifference to her serious medical needs.

## JURISDICTION & VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, federal

question jurisdiction, and 28 U.S.C. § 1343, civil rights jurisdiction.

3.      Venue is proper in this Judicial District pursuant to 28 U.S.C. Section 1391(b)

because the claim arose in this Judicial District.

## PARTIES

4.      Plaintiff Sarah Tonin is a qualified individual with a disability under the ADA.

She is a below-the-knee amputee who requires a prosthetic leg to ambulate. She was incarcerated

at Coffee Creek Correctional Facility (hereinafter, "CCCF") from March 7, 2024, to June 2,

2025.

5.      Defendant State of Oregon operates Oregon Department of Corrections which is

an agency of the State of Oregon. ODOC owns and operates prisons in Oregon, including CCCF,

and is responsible for the inmates in its facilities. ODOC is a public entity subject to Title II of the ADA.

6.    Defendant Miranda Shockey-Dunn is and was at all relevant times a nurse at CCCF. Defendant Shockey-Dunn acted under color of law and is sued in her individual capacity.

7.    Defendant Lisa Arrington is and was at all relevant times the Diversity/ADA Coordinator. Defendant Arrington acted under color of law and is sued in her individual capacity.

8.    Defendant Marica Ventura is and was at all relevant times an ADA Manager. Defendant Ventura acted under color of law and is sued in her individual capacity.

9.    Defendant Gareth Fitzpatrick was at all relevant times a Nurse Manager at CCCF. Defendant Fitzpatrick acted under color of law and is sued in his individual capacity.

10.   Defendant J. Wilson was at all relevant times a medical provider at CCCF. Defendant Wilson acted under color of law and is sued in their individual capacity.

11.   Defendant Michele Bergmann was at all relevant times a medical provider at CCCF. Defendant Bergmann acted under color of law and is sued in her individual capacity.

12.   Defendant Deborah Sprint upon information and belief is and was at all relevant times the ADA Manager. Defendant Sprint acted under color of law and is sued in her individual capacity.

13.   Defendant Warren Roberts was at all relevant times the Chief of Medicine of ODOC. Defendant Roberts acted under color of law and is sued in his individual capacity.

14.   Defendant Michael Seale is and was at all relevant times the Chief of Medicine of ODOC. Defendant Seale acted under color of law and is sued in his individual capacity.

15.     Defendant John/Jane Doe 1 is an individual employed by ODOC and was at all relevant times responsible for coordinating transportation at CCCF to outside medical appointments. The identity of Defendant Doe 1 is not known at this time but as discovery is made available this individual will be identified and substitute for Defendant Doe 1. Defendant Doe 1 acted under color of state law and is sued in their individual capacity.

16.     Defendant John/Jane Doe 2 is an individual employed by ODOC and was at all relevant times responsible for scheduling outside medical care at CCCF including specialty appointments and referrals to outside medical providers. The identity of Defendant Doe 2 is not known at this time but as discovery is made available this individual will be identified and substitute for Defendant Doe 2. Defendant Doe 2 acted under color of state law and is sued in their individual capacity.

17.     Defendant John/Jane Doe 3 is an individual employed by ODOC and was at all relevant times responsible for ensuring individuals with outside medical transports at CCCF were provided with adequate notice of the transport. The identity of Defendant Doe 3 is not known at this time but as discovery is made available this individual will be identified and substitute for Defendant Doe 3. Defendant Doe 3 acted under color of state law and is sued in their individual capacity.

## FACTUAL ALLEGATIONS

18.     Plaintiff is a below-the-knee amputee who has relied on a prosthetic leg for ambulation since childhood. With a functioning prosthetic, she is able to walk, perform daily tasks independently, and participate fully in her environment. Without it, she is functionally immobile and dependent on assistive devices and accommodations to meet her basic needs.

19.    Plaintiff entered ODOC custody on March 7, 2024, and was housed at Coffee Creek Correctional Facility (CCCF). On March 11, 2024, she notified CCCF medical staff that her prosthetic was broken and unusable. The prosthetic's foot was detached or non-functional, rendering it impossible for her to bear weight or ambulate safely.

20.    Plaintiff's family promptly contacted Hanger Clinic, her outside prosthetic provider, and coordinated the shipment of the necessary replacement part. All that remained was for ODOC to transport Plaintiff to the clinic for the prosthetic to be repaired or refitted.

21.    When Plaintiff first arrived at CCCF, she was threatened with disciplinary action for asking someone to carry her tray of food because she would not push her wheelchair and carry her food at the same time. Another inmate was only allowed to assist Plaintiff after receiving provider approval. When Plaintiff had to try to carry her tray and move in her wheelchair, she frequently was unable to finish her meals because of the length of time it took to get her food.

22.    On March 15, 2024, Plaintiff submitted a kyte to Defendant Arrington. She explained that she was wheelchair bound and had to carry her tray while pushing herself. On March 18, 2024, Defendant Sprint responded that they would email medical services for assistance.

23.    On March 28, 2024, Plaintiff's broken prosthetic was recorded in her medical records and the Therapeutic Levels of Care Committee (hereinafter, "TLC") approved a Hanger Clinic appointment.

24.    Despite repeated efforts from Plaintiff and her family, CCCF medical staff failed to ensure that she was seen by Hanger Clinic for nearly six months. CCCF records indicate minimal or delayed documentation of efforts to schedule her offsite care.

25.     As a result, Plaintiff was confined to a poorly fitting wheelchair. The wheelchair was too wide which made it difficult to self-propel and caused bilateral shoulder pain, hand numbness, and suspected carpal tunnel syndrome, further reducing her independence

26.     Plaintiff is at a higher risk of impaired blood circulation due to the surgical removal of certain arteries in her legs as a child during efforts to preserve the leg that was ultimately amputated. Prolonged periods of sitting in a wheelchair solely due to delays in scheduling appointments to Hanger Clinic put her at increased risk of life-threatening vascular impairments.

27.     CCCF's hallways and doors were not wide enough for Plaintiff to move around the facility without extreme difficulty. These conditions impeded Plaintiff's ability to maintain personal hygiene, go to the bathroom, eat enough during mealtimes, perform work duties, use the law library services, make legal phone calls, attend religious services, and safely respond to fire drills.

28.     There was only one ADA compliant shower that Plaintiff had access to. For months, the shower seat was broken, and Plaintiff had to drag in a plastic chair from one of the phone stations into the shower stall.

29.     One of the bathroom stalls in Plaintiff's unit was not wheelchair accessible because it was not wide enough for a wheelchair to turn into. The bathroom door also wouldn't stay open unless someone was behind Plaintiff as she tried to wheel herself in.

30.     Plaintiff worked as a computer lab clerk, and she could not move around the computer lab unless another prisoner pushed things out of the way for her.

31.     Law library services were effectively unavailable to Plaintiff because there was not enough space between the bookshelves to fit her wheelchair.

32.    On two or three different occasions, Plaintiff was unable to participate in important legal calls with her attorney because her large wheelchair would not fit into the phone booths. Plaintiff would proactively try to leave early for her legal calls so that she could request the call be transferred into a call room with enough space for her wheelchair, but she was not always able to leave with enough time to make that request.

33.    Being outside and away from the narrow hallways and doorways of CCCF had its own set of challenges because Plaintiff's chair was rendered unusable on grassy or sandy surfaces. Twice during Plaintiff's time at CCCF, religious services were outside on the grass, and she could not attend. In addition, during a fire drill, Plaintiff was reprimanded for remaining on the sidewalk rather than lining up on the sandy volleyball court with the rest of the prisoners who were not wheelchair bound.

34.    On April 3, 2024, Plaintiff was seen by her provider. They noted her broken prosthetic leg and requested a consultation at Hanger Clinic. On April 12, 2024, TLC approved this request, however an appointment was never scheduled.

35.    On April 8, 2024, Plaintiff submitted a kyte to medical stating that she missed an attorney call because it took too long to push herself to the phones. She requested someone push her wheelchair for appointments that were far away. On April 9, 2024, a medical staff member responded and told her to discuss it with her provider at her upcoming appointment.

36.    On April 16, 2024, Plaintiff submitted a kyte to Medical Management inquiring why her medical hold prevented her from being transferred to minimum custody. On May 1, 2024, medical staff responded that Plaintiff's medical needs, including the need for 24-hour care, limited her ability to be transferred to CCCF minimum.

37.     On April 21, 2024, Plaintiff submitted a kyte to "Medical – Provider" asking for an appointment to discuss receiving x-rays of her left knee and shoulders, as well as pain management for those problem areas. On April 23, 2024, Defendant Shockey-Dunn wrote back, "You will be scheduled for sick call regarding your pain."

38.     On April 26, 2024, Plaintiff submitted a kyte to her medical provider requesting that her medical hold be lifted because it was preventing her move to CCCF minimum and being accepted into the eyeglass program. On April 27, 2024, Defendant Shockey-Dunn responded that she had an upcoming chart review.

39.     On May 3, 2024, Plaintiff wrote a kyte to "BHS" stating, "I'm really frustrated with some things that have been going on [and] it is having a major impact on my current situation, living situation, [and] future after I'm released [and] now it's affecting me physically causing stress and anger."

40.     On May 4, 2024, Plaintiff submitted a kyte to her provider, Defendant Wilson, urgently requesting an appointment. She conveyed she'd sent numerous kytes regarding her medical problems and still hadn't spoken to anyone about her issues or pain. On May 4, 2024, medical wrote back, "You have a chart review this week to review your old records. I have made you an appointment with the nurse to discuss urgent needs as well. Please watch your callouts."

41.     On May 20, 2024, Plaintiff was seen by her provider, Defendant Wilson, who noted "AIC has prosthetic lower limb but foot is broken so stuck in wheelchair. Approved by TLC to go to Hanger."

42.     On May 28, 2024, Plaintiff submitted a kyte to "Medical-Wilson" asking for an update on the foot of her prosthetic being replaced. She stated, "You have the information from Hanger Clinic the last time I was in to see you [and] you were going to email them and see if

they had the foot so I could go to their office and get it fixed. Was just curious if you have any updates on that because I'm anxious to walk again and get out of this chair. Thank you!" On May 29, 2024, medical wrote back, "I don't see that appt on your schedule yet. Thank you."

43.    On June 2, 2024, Plaintiff submitted a kyte to "Medical – Wilson" asking to be put back on the pain medication and muscle relaxers she had prior to being incarcerated. She explained the excruciating pain she was in and asked if they could go to the TLC with this request. On June 3, 2024, medical wrote back, "You have been referred to provider."

44.    On June 6, 2024, Plaintiff submitted a kyte to medical stating that she needed to be seen by her provider immediately for a cortisone injection of her left knee and to discuss the severe pain in her knee, hands, and shoulders. She asked, "Also can someone please make sure the prosthetic place I go to (Hanger Clinic) knows that the foot needs to be replaced so they have it (not just "fixing it") and schedule please. I need to be walking! Thanks." On June 9, 2024, medical wrote back, "An appointment has been requested."

45.    On July 24, 2024, Plaintiff was seen at sick call to discuss her wheelchair being too wide for her to effectively use. She requested the arms and footrests be removed to make it easier to navigate. However, medical staff informed Plaintiff that, pursuant to a policy or directive issued by CCCF management, including Doe Defendant 4, wheelchairs could not be altered due to purported safety concerns

46.    On July 31, 2024, Plaintiff submitted a kyte to medical asking for a different wheelchair due to her current wheelchair being too wide and the footrests getting in her way. On August 1, 2024, Defendant Shockey-Dunn wrote back, "You will be scheduled for sick call."

47.    On August 2, 2024, Defendant Shockey-Dunn wrote to Plaintiff that pursuant to ODOC policy and pursuant to directives from a manager,  wheelchairs could not be altered due

to safety concerns. She further stated, "I have scheduled a sick call next week to measure her wheelchair and try to find a better fitting one."

48.    On August 19, 2024, Plaintiff submitted a kyte to "Medical – Provider" detailing the medical problems she's been experiencing due to their medical neglect and inability to schedule an appointment with the Hanger Clinic for her prosthetic replacement. She stated, "My shoulders are torn so pushing myself around is causing pain and more injury. Pushing myself has also caused extreme pain in my hands and fingers as well as neuropathy and an inability for some of my fingers to bend normally (it's like they are locked in position)." In addition, Plaintiff explained that her stump[1] hung off the edge of the wheelchair causing it to swell. She explained that "my stump cannot be treated this way because it displaces the tissue which means my prosthesis won't fit normally [and] that means it will be painful to walk again due to the prolonged time of not wearing it."

49.    On August 21, 2024, a referral form was filled out by Defendant Bergmann, for Plaintiff to have a consultation at Hanger Clinic.  CCCF's own internal health referral document to the Hanger Clinic stated, "due to patient not being able to wear leg, scheduling is urgent."

50.    On August 23, 2024, Plaintiff submitted a kyte to "Arrington/Ventura" stating that she received kyte responses regarding complaints of areas in the facility not being ADA compliant and she requested 2 ADA complaint forms.

51.    On August 26, 2024, Plaintiff submitted a kyte to medical stating, "Nurse Marla found a wheelchair for me and was going to get the feet rests removed for me. I am just checking on the status of this please." On August 27, 2024, medical responded saying, "I attempted to

---

[1] A "stump", also known as a residual limb, refers to the remaining healed part of an amputated limb that is designed to bear weight with a prosthetic socket.

remove the leg rest but I could not get it off. I will have to figure out how to get them removed as physical plant does not do it." The medical staff member's signature was illegible.

52.     On September 1, 2024, Plaintiff submitted a kyte to medical expressing her frustration that her last appointment with Defendant Bergmann was only 10 minutes.

53.     On September 4, 2024, Plaintiff submitted a kyte to Defendant Shockey-Dunn asking if she had been able to have someone remove the footrests from her wheelchair. Plaintiff stated, "This chair I have is getting worse each day. I can't even get through doorways or navigate in a room because the footrests aren't secure and are flapping around everywhere. My shoulders are in constant pain because I have to stretch over this wide chair and often have to get pushed." On September 6, 2024, Defendant Shockey-Dunn replied, "Per management, we are not able to remove/alter the feet or accessories to wheelchairs. I'm sorry."

54.     On September 6, 2024, Plaintiff submitted a kyte to medical describing her pain as unbearable. She stated, "I haven't received any pain meds or any of my other medications that help w/ the pain (like muscle relaxers for the phantom pain) and migraine medications. My kyte requests all come back telling me to 'discuss w/ provider' but I'm not scheduled to see her until the end of the month. Can you please get me in sooner?" On September 8, 2024, a medical staff member responded, "Your providers schedule is completely booked until your appointment day. I would keep the appointment you have as we do not have anything sooner."

55.     On September 7, 2024, Plaintiff submitted a kyte to medical conveying how difficult it was to move around in her wheelchair and the safety hazard it presented. She stated, "I got measured for a smaller chair and if you don't take the feet rests off, then get me one that already has them removed. Please! I can't get around and can't work because of this! This has

halted my abilities to function! Please help me!" On September 8, 2024, medical responded with, "Scheduled for sick call."

56.    On September 8, 2024, Plaintiff submitted a kyte to medical asking if anyone had reached out to the Hanger Clinic regarding the replacement prosthetic she needed. She stated, "It's been over 6 months that I've been unable to walk and I'm having major issues in my stump. This is important and needs to be fixed asap. Every time I speak w/medical (including Bergman as recent as last month) they all say there's no notes about it and it's news to them. I want to make sure something is actually being done." That same day, medical responded, "Sick call appointment requested."

57.    On September 16, 2024, Plaintiff submitted a kyte to "Medical – Marla" requesting an update on her smaller wheelchair. She stated, "I desperately need one ASAP. It is extremely hard to push or get pushed because it feels like it's going through mud. Feet rests are not completely fastened on so they flail about and have hit people. Metal on wheel cuts my hand when I push myself." On September 17, 2024, medical responded with, "We're still awaiting on a new supply of wheelchairs."

58.    On September 25, 2024, Defendant Bergmann wrote a progress note confirming that Plaintiff had been scheduled for an orthopedic appointment regarding her shoulders. The note further stated that Plaintiff's wheelchair was too wide, requiring her to propel herself in an "unnatural position" with her arms. Defendant Bergmann indicated that she ordered a narrower wheelchair for Plaintiff.

59.    The following day, on September 26, 2024, Plaintiff submitted a kyte to Defendant Shockey-Dunn asking about any updates on a new wheelchair. On September 27, 2024, Defendant Shockey-Dunn replied, "You will be scheduled for sick call next week."

60.     On October 4, 2024, Plaintiff submitted a kyte to medical stating, "I need cortisol injections in both shoulders and left knee since my surgery seems to be getting delayed." On October 6, 2024, medical responded with, "You have been scheduled to see your provider. Her next available appt is a month out."

61.     On October 8, 2024, Plaintiff submitted a kyte to medical stating, "I am really concerned w/ the amount of pain and limited mobility I'm suffering with on both my shoulders and my left knee that I needed surgery on. It has gotten much worse and I need to get x-rays and see images of the damage please." On October 9, 2024, medical responded with, "Nurse sick call."

62.     On October 10, 2024, Plaintiff filed grievance #CCCF_2024_10_032 grieving medical over the lack of care for her severe shoulder pain She stated, "I've seen the provider Bergmann twice and was told she could/would do cortisone injections and an x-ray. Neither has happened." Moreover, she expressed that she's followed the proper protocol to alert medical of her problems, but that no one has responded to her recent kytes and she feels neglected and ignored. On October 16, 2024, the grievance was accepted and sent for a response. On December 13, 2024, Defendant Fitzpatrick responded stating that Plaintiff had x-rays of both her shoulders and she discussed cortisone injections with her provider. On December 25, 2024, Plaintiff filed grievance appeal #CCCF_2024_10_032A in which Plaintiff confirmed receiving x-rays and discussing cortisone injections but that importantly "there is no medical professional at CCCF who gives them [cortisone injections], so it does me no good. It is also true that x-rays were done however no x-rays have been given to the provider so my last 2 appointments she was unable to see them."  On January 6, 2025, Plaintiff's grievance appeal was accepted and sent for a response. On March 24, 2025, Defendant Seale responded to Plaintiff's grievance appeal. He

stated in his response that Plaintiff's provider reviewed x-ray imaging of her shoulders on February 13, 2025—almost three months after they were first taken—and that her provider recommended physical therapy.

63.    On October 12, 2024, Plaintiff submitted a kyte to medical stating that she had been informed her new wheelchair was expected to arrive the previous Thursday and requesting to be seen. Later that day, RN D. James responded that the wheelchair had arrived.

64.    Plaintiff was not seen at Hanger Clinic until October 16, 2024, who confirmed she needed a replacement foot piece for her prosthetic.

65.    Defendant Roberts was aware of the ongoing delays in treatment and prosthetic care. Defendant Roberts spoke with Defendant Bergmann about plaintiff's care and ordered that she should be sent to the Hanger Clinic. This did not happen at any time prior to Defendant Roberts' being terminated in December 2024.

66.    On October 23, 2024, Defendant Bergmann wrote in a physician's order to schedule Plaintiff for an appointment at Hanger Clinic for a new prosthesis in 4-6 weeks. The notes stated, "Pink sheet done. L1 per. Dr. Roberts."

67.    On October 23, 2024, Plaintiff filed grievance #CCCF_2024_10_080 grieving "Roberts [and] TLC Board" regarding lack of medical care and the denial of her pain management despite repeated requests and medical records documenting her healthcare needs. On October 24, 2024, the grievance was accepted. On December 13, 2024, Defendant Fitzpatrick responded to the grievance stating she had x-rays of both her shoulders and that she had discussed cortisone injections with her provider. On December 25, 2024, Plaintiff filed grievance appeal #CCCF_2024_10_080A in which she emphasized "the current medications for pain are not working [and] my pain has worsened dramatically. My previous grievance also detailed how

the pain is so severe that it has limited my mobility [and] day to day functions dramatically". On January 6, 2025, the grievance appeal was accepted and sent for a response. On March 26, 2025, Defendant Seale responded that it was determined physical therapy would be more beneficial to her than steroid injections and that she had multiple appointments to discuss her concerns.

68.     On November 1, 2024, Plaintiff submitted a kyte to medical explaining that she was still waiting to see her provider and stated, "I keep getting put off and the last time I was told it would be sometime next month. That month has come and gone. When am I seeing [my] provider? I still haven't been able to discuss things with a doctor since arriving here 8 months ago." The response written the same day stated, "Reviewed your schedule you have an upcoming appointment with provider Bergmann to discuss cortisone injection watch your callouts." The staff member's signature was illegible.

69.     On November 14, 2024, Plaintiff submitted a kyte to medical stating that she couldn't stand because of her knee and couldn't shower or sleep because of her shoulders. On November 15, 2024, medical responded, "I'm sorry. I did schedule to renew your Celebrex."

70.     On November 14, 2024, Plaintiff submitted a kyte to medical asking why her Celebrex wasn't refilled. On November 15, 2024, medical staff responded, "I'm sorry for the short notice. It looks like Bergmann only wrote a 1 month prescription . . ."

71.     On November 16, 2024, Plaintiff submitted a kyte to medical inquiring when her Celebrex prescription would be renewed and reporting that she was experiencing "brain zaps" and vertigo. On November 17, 2024, RN Chatman responded that a chart review had been scheduled.

72.     On November 21, 2024, Defendant Bergmann requested a prosthetic foot for Plaintiff. On November 21, 2024, TLC approved this request. On November 21, 2024, a referral

sheet was filled out and Plaintiff's appointment with the Hanger Clinic was scheduled for January 27, 2025.

73.    On November 21, 2024, Plaintiff received x-rays of her shoulders. Her left shoulder had "mild acromioclavicular osteoarthritis and her right shoulder had "mild acromioclavicular spurring."

74.    On November 25, 2024, Plaintiff submitted a kyte to "ADA – Lisa Arrington" regarding her ADA complaint form. She stated that she had submitted the ADA complaint form months earlier but had not received a response and that no changes had been made to address her concerns. On November 26, 2024, the response stated, "I was not in the facility at the time you made a request and have no involvement. This was addressed by Ms. Sprint. Your issue is medical related and you need to speak to them about an ADL." Upon information and belief, Defendant Arrington wrote the response.

75.    On December 1, 2024, Plaintiff submitted a kyte to medical requesting to be seen for her knee. She explained she couldn't stand for short periods of time, and the pain was extremely sharp and severe. She begged for help. On December 2, 2024, medical staff responded that an appointment had been made.

76.    On December 8, 2024, Plaintiff submitted a kyte to medical asking when she would receive the new wheelchair she had been waiting for several months. On December 10, 2024, medical responded that she was scheduled for sick call.

77.    On December 17, 2024, Plaintiff submitted a kyte to medical regarding her intense shoulder pain. She stated she got x-rays on November 21, 2024, and that during her appointment with her provider on December 11, 2024, the x-rays weren't on file. She said that no one had reviewed the results with her and she was waiting on images of her left knee because

she couldn't stand. On December 17, 2024, medical responded that she had an upcoming provider appointment on December 18, 2024.

78.     On December 23, 2024, Plaintiff submitted a kyte to medical detailing her excruciating left knee pain and stated, "I'm following up to make sure this doesn't fall through the cracks again since I'm in pain and have been pleading for help w/ this since I arrived @ CCCF". The response written the same day stated, "You have an outside appointment scheduled with a specialist." The staff member's signature was illegible.

79.     Plaintiff was never seen by an orthopedic specialist during her time at CCCF.

80.     On December 24, 2024, Plaintiff submitted a kyte to medical about her Hanger Clinic appointment being cancelled. She wrote, "yesterday I was dressed out to leave to Hanger Clinic in Portland before being told it was cancelled." On December 26, 2024, medical responded that the cancellation came from Hanger Clinic and that she would be rescheduled.

81.     On December 26, 2024, Plaintiff submitted a kyte to Defendant Arrington regarding the ADA compliance complaint. Plaintiff explained that CCCF and her unit were not handicapped or wheelchair accessible. She stated that she hadn't received a response and she sent the complaints months ago. On December 30, 2024, Defendant Sprint responded asking if she knew when the complaint was submitted as she didn't have anything in her files.

82.     On January 16, 2025, Plaintiff submitted a kyte to medical explaining that her prosthetic leg had been approved the previous year but that she still had not been taken to Hanger Clinic for repairs. She further reported that her stump, hands, and shoulders were worsening from prolonged wheelchair use. On January 17, 2025, a medical staff member responded, writing, "emailed office staff who schedule outside appointments about your concerns." Upon

information and belief, the office staff responsible for scheduling outside medical appointments is Defendant Doe 2. The responding staff member's signature was illegible.

83.     On January 27, 2025, Plaintiff went back to Hanger Clinic to retrieve her repaired prosthetic, only to find that the socket no longer fit her stump and could not be repaired with the previously ordered part.

84.     In the outside provider's section of CCCF's internal health referral document it was noted that the new foot was put on but that the "socket is old and will need to be replaced."

85.     After ten months of waiting, Plaintiff's stump had dramatically changed shape due to non-use, and she was sent back to CCCF with a prosthetic leg that did not fit, and her wheelchair confiscated from her. Plaintiff frequently attempted to walk with her ill-fitting prosthetic which caused extreme pain in her stump. Walking became excruciating as she had to rely on crutches which put additional pressure on her shoulders, hands, and left knee.

86.     Shortly after her Hanger Clinic appointment in January 2025, Plaintiff's severe pain from the improperly fitting prosthetic prevented her from going to multiple medline callouts. As a result, she missed several Cymbalta doses and the side effects that followed were so severe she was too afraid to resume taking it.

87.     Despite repeatedly informing medical staff that Cymbalta only provided minimal pain relief, Plaintiff consistently took it as prescribed from approximately March 2024 until February 2025. When Plaintiff shared her concerns about the withdrawal symptoms she experienced from Cymbalta and once again requested alternative pain management medications, her request was written up as a refusal to try anything other than Vicodin or Morphine. On January 30, 2025, Plaintiff submitted a kyte to medical stating that her knee was much worse,

and she still hadn't seen a specialist. On February 1, 2025, medical responded that she was scheduled for sick call and a provider appointment.

88.     On January 31, 2025, Plaintiff submitted a kyte to medical reporting ongoing shoulder pain. She stated that she had undergone x-rays several months earlier but that no one had reviewed the results with her, and that the pain was limiting her ability to perform daily activities. On February 1, 2025, medical responded that she was scheduled for sick call and a provider appointment.

89.     On February 3, 2025, Plaintiff informed medical staff that her bilateral shoulder pain and knee pain were a "10/10" on the pain scale. She reported that the severe pain in her shoulders was caused by having to push the ill-fitting wheelchair and requested crutches.

90.     On February 6, 2025, Plaintiff submitted a kyte to medical/provider about her prosthetic leg. She stated that she'd been in a wheelchair for the last 11 months because her prosthetic leg was broken, but now that it was fixed, she needed to learn how to walk again. She requested a chart review and crutches. On February 7, 2025, medical responded that she was scheduled for sick call. Plaintiff then wrote that she was told Defendant Bergmann was leaving and couldn't see a new provider until March, and she requested to be seen sooner.

91.     On February 7, 2025, Plaintiff filed grievance #CCCF_2025_02_025 due to not being given crutches. On February 7, it was accepted and sent for a response. On March 19, 2025, Defendant Fitzpatrick responded that they had the opportunity to meet, and he wrote an order for crutches per nurse protocol.

92.     On February 9, 2025, Plaintiff filed discrimination complaint form #CCCF_2025_02_036 discussing the handicap shower missing a bench, making it inaccessible for her in a wheelchair. The physical plant placed a plastic chair in there as a solution, which was

not only difficult to move in a stall while in a wheelchair, but also extremely unstable. She requested a shower bench be installed. On February 10, 2025, Plaintiff's grievance was returned because she had more than four active complaints.

93.    On February 10, 2025, Defendant Fitzpatrick ordered crutches for one month for Plaintiff.

94.    On February 12, 2025, Plaintiff submitted a kyte to Defendant Arrington regarding the ADA showers. She kyted to Defendant Arrington directly because "my grievance was denied because I have other open ones in appeal status, but I wanted to make you aware of a big problem." The problem was that the shower bench was removed from the only ADA accessible stall months ago and that the "temporary solution" was a plastic chair which is "difficult to navigate w/ one leg [and] a wheelchair [and] is a fall risk." The response from medical the following day stated, "Thank you. This is being addressed." The staff member's signature was illegible.

95.    On February 14, 2025, Plaintiff submitted a kyte to medical regarding her prosthetic leg and her need for pain medication. She expressed concern that no one had looked at her knee because it needed to be replaced and she couldn't fully straighten it.

96.    On February 15, 2025, Plaintiff submitted a kyte to her Behavioral Health Services provider, Mobbs, about her mobility limitations with her prosthetic leg. She explained that she was relearning how to walk and that the distance she had to travel down the corridor to the medline caused her to miss her medications. She requested in-cell medline. On February 20, 2025, Mobbs approved select medicine in-cell.

97.    On February 20, 2025, Plaintiff submitted a kyte to medical stating that she was experiencing daily severe pain and that her mobility had worsened. On February 21, 2025,

medical responded that she was tentatively scheduled to see her provider on March 19, 2025, and advised that if she needed to be seen sooner she should submit a kyte requesting sick call. On February 24, 2025, Plaintiff replied that in her grievance appeal dated February 10, 2025, she had been informed she would see a provider that week. She stated that she had already been waiting for months to see her provider and a specialist regarding her knee and shoulders. On February 25, 2025, medical responded that she had an upcoming sick call and provider appointment.'

98.     On February 26, 2025, Plaintiff informed medical staff that she was using a wheelchair again because of blisters forming on her stump.

99.     On March 4, 2025, Plaintiff submitted a kyte to Defendant Fitzpatrick reminding him that she needed her appointment with her provider scheduled and an 18" wheelchair without foot pedals. On April 8, 2025, over a month later, Defendant Fitzpatrick replied, "If these are still not addressed, please let me know."

100.     On March 5, 2025, Plaintiff was seen by Defendant Bergmann who ordered an appointment with Hanger Clinic for her right leg prosthesis, x-rays of her left knee, a consultation for Plaintiff's left knee cortisone injections with Dr. Cuff, and a consultation with Dr. Mobbs for her pain control. Defendant Bergmann requested a follow-up appointment with Plaintiff in 4 weeks.

101.     On March 25, 2025, Plaintiff submitted a kyte to medical stating, "When I finally get to see a provider I'm either told no or that they'll look into it. With limited appt. times and the extended long periods of time to see a provider, there are items that continue to go unaddressed or forgotten. Please have provider follow-up on the following things: modafinil medications (for narcolepsy), and a medication/s that works for pain, an appt w/ Hanger Clinic to

get fitted for my new prosthesis, appt. w/a specialist for shoulders and knee and hands for imaging and recommendations for treatment." On March 26, 2026, medical responded saying that, "Follow up regarding medications will be chart reviewed. Outside appt./ specialist appt. are ordered by providers, it will need to be discussed with the provider at your appointment. You have one scheduled." The staff member's signature was illegible.

102.    On April 7, 2025, Plaintiff submitted a kyte to medical that she was repeatedly told she had upcoming appointments, but they needed to happen soon because she was about to be released on parole. Medical responded with, "You have an upcoming appt w/ the provider this week. You also have an appt later this month w/ Dr. Mobbs."

103.    On April 10, 2025, Defendant Bergmann wrote in a progress note that Plaintiff's drop arm test was positive which indicates a torn rotator cuff. An ultrasound was ordered.

104.    Plaintiff never received an ultrasound of her shoulders while in CCCF custody.

105.    On April 11, 2025, Dr. Cuff wrote to Plaintiff advising that she should avoid frequent knee injections unless they were recommended by an orthopedic surgeon following a consultation. Dr. Cuff also recommended that Plaintiff schedule an appointment with a community specialist as soon as possible. '

106.    On April 24, 2025, Defendant Bergmann wrote to Plaintiff that an appointment was scheduled to discuss pain control. Upon information and belief, the appointment never occurred.

107.    On May 12, 2025, Plaintiff submitted a kyte to Defendant Arrington regarding the unresolved issues with her prosthetic leg. She stated, "I came to CCCF w/an artificial leg, but wasn't able to wear it because it required a repair. It took CCCF almost a year to finally send me to Hanger Clinic to get it fixed and in that time, my stump became misshapen due to non-use and

I require being fitted for a new prosthesis. TLC approved for this to happen sometime last year, yet nothing has happened." She continued explaining that when she spoke to Defendant Fitzpatrick, he explained that her appointment had fallen through the cracks, but that she would be scheduled soon. She stated, "That was months ago and still nothing has happened. A family member's call to Hanger Clinic confirmed they have availability for an appt, so why has nothing happened? I'm paroling soon, is that why ODOC is choosing not to help me? I came here walking and now I'm leaving in a wheelchair. Please help!" Medical responded with, "Your appointment is coming soon with Hanger Clinic."

108.    On May 21, 2025, Plaintiff was notified of transport to Hanger Clinic to obtain a replacement prosthetic socket. Defendant Doe 3 provided Plaintiff with only a few minutes' notice before the scheduled transport. Because Plaintiff required her prosthetic leg for the appointment, she wheeled herself to her cell to retrieve it and then proceeded through the required procedures to leave the facility. By the time Plaintiff reached transport, the appointment had been cancelled because she was deemed late. Upon information and belief, Defendant Doe 1, who was responsible for coordinating medical transport, cancelled the transport.

109.    A progress note from May 21, 2025, stated the following: "AIC was brought here to the infirmary because she was not taken by transport to her outside appointment to Hanger Clinic Prosthetics because she was late. She stated she did not get enough time so she was late. Contacted Nurse Manager Fitzpatrick and was instructed to write a note and he will speak to the Medical Services Manager about this." The medical staff member's name was illegible.

110.    CCCF did not timely reschedule or facilitate a socket fitting or replacement, nor did it provide any viable interim accommodation. The delay persisted even after clear

documentation from medical staff acknowledging Plaintiff's need to return to Hanger Clinic for fitting and adjustment.

111.    Without her prosthetic, Plaintiff was denied access to nearly every service and program offered in ODOC's correctional setting. She could not participate in work assignments, religious programming, legal library services, or legal calls. Her movement was severely restricted both within the housing units and outside on the prison grounds.

112.    Plaintiff was also unable to participate in routine recreation or wellness programming due to immobility, causing both physical deconditioning and emotional distress. She was largely confined to her cell for extended periods of time due to her inability to move about safely and independently.

113.    On several occasions, she was injured or at risk of injury while attempting to maneuver with her wheelchair over uneven surfaces or through inaccessible corridors and doorways in CCCF. Among other things, this made it impossible for Plaintiff to safely comply with fire drill procedures. Her inability to ambulate with a prosthetic also made toileting and hygiene more difficult, depriving her of basic dignity and exposing her to increased risk of infection and injury.

114.    Due to these limitations Plaintiff frequently struggled to complete basic daily activities within the allotted time frames or in a safe manner. Specifically, she was often unable to finish her meals in time, to shower safely without difficulty, to fit into standard-sized bathrooms, or to make it to medline or legal phone calls.

115.    ODOC's failure to provide timely access to a replacement prosthetic or proper fitting for a new one denied Plaintiff the opportunity to participate equally in institutional

services, programs, and activities. It also deprived her of physical autonomy and exposed her to unnecessary suffering.

116.    CCCF staff knew that Plaintiff was a leg amputee. Her condition was obvious and documented at intake. Nonetheless, they failed to act on her repeated requests for care, failed to ensure transportation to the prosthetic provider, and failed to implement any reasonable alternative accommodation that would allow her to regain mobility.

117.    The prosthetic was readily available, and Plaintiff had an established provider relationship. CCCF's only obligation was to ensure her timely transport and to coordinate her care. The failure to do so was not an isolated oversight—it persisted for the majority of Plaintiff's incarceration.

118.    As a result of this sustained failure, Plaintiff experienced physical pain, functional deterioration, social isolation, depression, and humiliation. She also suffered secondary injuries caused by overcompensating for her immobility, including worsening shoulder pain, knee pain and nerve damage resulting in chronic pain conditions.

119.    ODOC's failure to provide a working prosthetic or to coordinate timely care was not a mere oversight—it was a systemic breakdown and a failure to reasonably accommodate a known disability. This conduct denied Plaintiff access to the same services and programs available to nondisabled inmates, solely on the basis of her disability, in violation of Title II of the ADA.

120.    Plaintiff entered CCCF custody walking—she left CCCF custody unable to walk, with a prosthetic that no longer fit, and worsening chronic pain conditions in her shoulders and her knee from being forced into a wheelchair.  Since her release, Plaintiff has to navigate scheduling all of the appointments CCCF failed to complete. For the first time in her life,

Plaintiff must worry about securing housing, employment, and transportation that is wheelchair accessible. Her first post-release housing arrangement did not have functional elevator access. To ensure she gets to work on time, Plaintiff must arrive to the bus station early to secure the wheelchair-accessible seat. Even simple tasks such as grocery shopping now take significantly longer and she frequently relies on grocery delivery services which costs more money.

121.    Even under the best of circumstances, reentry is challenging. Plaintiff must face those challenges while simultaneously learning to adjust to life in a wheelchair.

**COUNT I**

**Violation of Title II of the ADA**

**(Against Defendant State of Oregon)**

122.    Plaintiff re-alleges all relevant prior paragraphs.

123.    Plaintiff re-alleges all preceding paragraphs.

124.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

125.    The Oregon Department of Corrections (ODOC), operated by Defendant State of Oregon, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the requirements of Title II of the ADA.

126.    Plaintiff is a qualified individual with a disability within the meaning of the ADA. She is a below-the-knee amputee who has relied on a prosthetic for ambulation since childhood. Without a prosthetic, she is unable to walk and requires mobility accommodations to perform daily tasks and access basic services.

127.    During her incarceration at Coffee Creek Correctional Facility (CCCF), ODOC
failed to provide Plaintiff with access to a properly functioning prosthetic leg for more than a
year, despite having actual knowledge of her condition, repeated requests for care, and access to
her treating prosthetist. This failure functionally rendered Plaintiff immobile, confined her to an
ill-fitting wheelchair, exacerbated other chronic health conditions, and deprived her of equal
access to ODOC's services and programs.

128.    ODOC failed to provide Plaintiff with a reasonable modification or
accommodation—namely, coordination of prosthetic care, prompt transportation to her outside
provider, or access to alternative interim mobility supports—despite the fact that such
accommodations were reasonable, medically necessary, and readily achievable.

129.    As a direct result of ODOC's failure to provide timely and effective
accommodation, Plaintiff was denied access to multiple services, programs, and activities offered
in ODOC custody.

130.    Plaintiff's immobility and lack of prosthetic also subjected her to daily pain,
humiliation, deterioration of physical function, and social isolation. She was unable to navigate
CCCF's physical environment without significant risk of injury, particularly given ODOC's
failure to provide an accessible or properly maintained wheelchair.

131.    These deprivations were not isolated or the result of a one-time lapse in care.
Rather, they were the product of ODOC's systemic failure to reasonably accommodate
Plaintiff's known disability and to ensure continuity of medically necessary prosthetic treatment.

132.    ODOC's failure to act constituted discrimination "by reason of" Plaintiff's
disability, within the meaning of the ADA. Plaintiff was treated differently from nondisabled

inmates and was excluded from services because ODOC failed to make reasonable modifications that would have enabled her participation on equal footing.

133.    Defendant's failure to accommodate Plaintiff's disability was not only unreasonable, it was deliberately indifferent. Despite ample opportunity and knowledge, ODOC did not take steps to correct the violation until it was too late to fit Plaintiff's socket to her stump and failed to ensure timely follow-up after the January 2025 visit to Hanger Clinic.

134.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered significant injury, including loss of mobility, physical pain, emotional distress, and exclusion from prison services.

135.    Plaintiff seeks declaratory relief, compensatory damages, attorneys' fees, costs, and any other relief the Court deems just and proper under 42 U.S.C. § 12133 and § 12205.

## COUNT II

**Violation of the Eighth Amendment – Deliberate Indifference to Serious Medical Need**

**(42 U.S.C. § 1983 – Against Defendants ODOC, Shockey-Dunn, Arrington, Ventura,**

**Fitzpatrick, Wilson, Bergmann, Sprint, Roberts, Seale, Does 1-4)**

136.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

137.    Plaintiff is entitled to timely and adequate medical care as part of her Constitutionally guaranteed conditions of confinement pursuant to the Eighth Amendment to the United States Constitution. Failure to provide timely and adequate medical care is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

138.    At all relevant times, Defendants Shockey-Dunn, Arrington, Ventura, Fitzpatrick, Wilson, Bergmann, Spring, Roberts, Seale, and Does 1-4 (the "Individual Defendants"), were acting under color of state law as employees of ODOC.

139.    Plaintiff's inability to walk without a prosthetic constitutes a serious medical need.

140.    Defendants were aware of Plaintiff's condition and her inability to ambulate without the prosthetic. They were also aware that she was suffering pain, isolation, and functional loss due to the delay.

141.    Despite having the authority and opportunity to act, Defendants failed to schedule timely care, facilitate fitting, or escalate the issue, demonstrating deliberate indifference to Plaintiff's serious medical needs.

142.    Defendants Arrington, Ventura, and Spring were repeatedly notified by Plaintiff that CCCF was not ADA compliant and that the facility could not accommodate her wheelchair. Despite this notice, these defendants failed to adequately investigate, respond to, or remedy the reported ADA violations.

143.    Defendant Shockey-Dunn was aware that Plaintiff was unable to walk without a functioning prosthetic and needed a wheelchair that better accommodated her needs yet failed to ensure Plaintiff received timely medical care or appropriate mobility aids.

144.    Defendant Wilson knew Plaintiff's prosthetic was broken and that she was confined to a wheelchair as a result yet failed to ensure that Plaintiff received timely referral and transportation to obtain the necessary prosthetic repair.

145.    Defendant Bergmann was aware of Plaintiff's ongoing pain, immobility, and need for prosthetic care and specialty treatment but failed to ensure that ordered referrals, appointments, and diagnostic testing were timely completed.

146.    Defendant Roberts, as Chief of Medicine, failed to ensure that Plaintiff received timely prosthetic care and adequate treatment for her serious medical needs. Defendant Roberts was aware of the ongoing delays in treatment and prosthetic care yet failed to correct the inadequate medical response to Plaintiff's serious medical needs.

147.    Defendant Seale, as Chief of Medicine, reviewed Plaintiff's medical grievances and appeals and was aware of the ongoing delays in treatment and prosthetic care yet failed to correct the inadequate medical response to Plaintiff's serious medical needs.

148.    Defendant Fitzpatrick reviewed and responded to Plaintiff's grievances concerning her untreated pain, mobility limitations, and lack of prosthetic care, yet failed to ensure that Plaintiff received timely medical treatment or appropriate follow-up care.

149.    Defendant Doe 1 cancelled Plaintiff's scheduled transport to her Hanger Clinic prosthetic appointment, which Plaintiff had waited months to obtain, leaving Plaintiff without a functioning prosthetic and unable to walk upon release from CCCF.

150.    Defendant Doe 2 denied or delayed Plaintiff's medical treatment by failing to adequately and timely schedule Plaintiff's outside medical appointments.

151.    Defendant Doe 3 failed to ensure that Plaintiff received adequate notice of her transport to Hanger Clinic so that she could return to her cell, retrieve her prosthetic leg, and return for transport.

152.    ODOC failed to provide Plaintiff with a wheelchair that properly fit her and failed to take appropriate action when Plaintiff's ill-fitting wheelchair created both mobility and safety concerns.

153.    As a result, Plaintiff suffered prolonged unnecessary pain, loss of mobility, physical deterioration, and psychological distress.

154.    Defendants' conduct violated Plaintiff's rights under the Eighth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and grant the following relief:

1.    Award Plaintiff compensatory damages against Defendant State of Oregon for physical injuries, pain and suffering, emotional distress, and loss of dignity resulting from Defendants' unlawful conduct.

2.    Award Plaintiff compensatory damages against the Individual Defendants in their individual capacities for their deliberate indifference to Plaintiff's serious medical needs under 42 U.S.C. § 1983.

3.    Award punitive damages against the Individual Defendants in their individual capacities for their reckless and willful disregard of Plaintiff's constitutional rights.

4.    Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205.

5.    Grant such other and further relief as the Court deems just and proper.

**Plaintiff demands a trial by Jury.**

DATED: March 9, 2026

                       **LAW OFFICE OF KATHARINE EDWARDS**

                       */s/ Abby Greenfield*
                       Abby Greenfield, OSB No. 243463
                       abby@kedwards-law.com
                       Tel: (503) 664-0645

                       John Burgess, OSB No. 106498
                       johnburgess@civilrightsoregon.com
                       Carl Post, OSB No. 061058
                       carlpost@civilrightsoregon.com
                       SNYDER, POST & BURGESS
                       Tel: (503) 241-3617
                       Attorneys for Plaintiff